**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 99-40574**

_____

**GEORGE A. CAREY,**

**Plaintiff-Appellant,**

**VERSUS**

**KENNETH S. APFEL, COMMISSIONER OF SOCIAL SECURITY,**

**Defendant-Appellee.**

_____

Appeal from the United States District Court
For the Eastern District of Texas

_____

October 5, 2000

Before GARWOOD, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

George A. Carey appeals from a final judgment in favor of the Commissioner of Social Security, which in turn affirmed the Commissioner's final decision denying disability benefits. The issue presented is whether the Commissioner properly determined that Carey was not disabled as of March 29, 1991, the last date on which he met the requirements for insured status under the Social

Security Act. *See* 42 U.S.C. § 423(c). We affirm.

**I.**

Carey filed an application for disability benefits under the Social Security Act in May 1994. *See* 42 U.S.C. §§ 416(i), 423. At that time, Carey was a 53-year-old man with the equivalent of a high school education. He had prior work experience as a carpenter's assistant, construction supervisor, laborer, and as a flagger working on construction sites. Carey's May 1994 claim stated disabling impairments associated with a 1971 back injury which required corrective surgery, and with a catastrophic electrical shock occurring in November 1983, which led to the amputation of Carey's left forearm and hand and to tissue loss and impaired functioning of his left leg.

Carey claimed total disability and the inability to work, with an onset date of February 15, 1985. The parties agree that Carey is not entitled to benefits unless he was disabled, within the meaning of the relevant statutes and regulations, on or before March 29, 1991, the date upon which he last enjoyed insured status under the Act. Thus, it is Carey's condition between February 15, 1985 (the date after which Carey claims he could no longer work), and March 29, 1991 (the date after which Carey was no longer insured for disability benefits), that is most probative on the pertinent issue of whether he was disabled before March 29, 1991, and is entitled to benefits.

2

Carey's claim for disability benefits was denied in July 1994. Carey requested reconsideration, and the claim was denied again in November 1994. Carey then requested an administrative hearing, which was held in February 1996.

The Administrative Law Judge received testimonial evidence from Carey concerning his condition in March 1991, and considered certain medical records offered by Carey. The ALJ also received testimonial evidence from a medical expert concerning the extent to which Carey's claim was borne out in the pertinent medical records, and from a vocational expert concerning Carey's residual capacity to perform certain identified jobs. *See* 20 C.F.R. §§ 404.1527(f), 404.1566(e).

In April 1996, the ALJ denied benefits, ruling that Carey was not disabled as of March 1991. Carey appealed, and the Appeals Council affirmed. The Appeals Council subsequently denied Carey's request for reconsideration, and the ALJ's decision became the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. § 405(g). Carey then filed this suit in the federal district court, which granted judgment in favor of the Commissioner. Carey timely appealed.

## II.

There is a five-step procedure for making a disability determination under the Social Security Act. This procedure was cogently set forth in *Crowley v. Apfel*, 197 F.3d 194 (5th Cir.

3

1999):

> The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Id*. at 197-98 (footnotes omitted).

There is no material dispute in this case with regard to the first four steps. Carey is not working, he has a severe, qualifying impairment, and he is unable to perform past relevant work. The burden is, therefore, on the Commissioner to show that Carey could perform other gainful employment. The ALJ held that

4

Carey was capable of gainful employment because he could perform certain light unskilled jobs identified by the testifying vocational expert.

The Commissioner's determination that Carey was not disabled before his insured status ended in March 1991 because he could perform available jobs must be affirmed unless that determination is either not supported by substantial evidence or involved an erroneous application of legal standards. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). Substantial evidence is something more than a scintilla but less than a preponderance. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Villa*, 895 F.2d at 1021-22. "The court does not reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *See Brown*, 192 F.3d at 496. Conflicts in the evidence are for the Commissioner to resolve. *Id*.

## III.

Carey maintains that the ALJ's decision was not supported by substantial evidence. Carey first argues that the ALJ should not have relied upon the medical expert's testimony because that expert

5

gave an inaccurate summary of Carey's medical records. Carey next argues that the ALJ should not have relied upon the vocational expert's testimony because the hypothetical questions posed to the vocational expert for the purpose of determining whether Carey could perform other gainful employment included, and were premised upon, the medical expert's inaccurate summary of Carey's medical records. Carey further objects to the ALJ's reliance upon the vocational expert's testimony on the ground that the expert's testimony that Carey could perform certain identified jobs with only one arm is in conflict with the description given those jobs in the Department of Labor's Dictionary of Occupational Titles.

Carey also maintains that the ALJ's determination that he was not disabled as of March 1991 is premised upon an erroneous application of the controlling legal principles. Specifically, Carey contends that the ALJ erroneously relied upon Medical-Vocational Guideline 202.21 when determining that Carey was not disabled, even though Carey's medical condition does not correspond to the terms of that guideline. We will first discuss the evidence presented in the administrative hearing, and then proceed to an analysis of Carey's specific appellate issues.

**IV.**

Carey's administrative hearing was held on February 9, 1996. Shortly before the hearing, Carey's counsel withdrew. Carey retained new counsel the day before the hearing. The ALJ began the

6

hearing by making sure that Carey's counsel had been given an adequate opportunity to review the record and prepare for the hearing. Counsel responded that he was prepared to proceed on Carey's behalf, but that he wanted to tender additional medical records, which he had reviewed the night before. Counsel explained that most of the documents contained information that was duplicative of information that was already in the social security file, and our independent review of the record confirms this fact. Many of the documents in the new submission were simply receipts showing that certain services were requested or referrals made on Carey's behalf. Many others, as counsel noted in the hearing, merely reported the raw data used in the generation of medical reports containing the more probative clinical findings. Still others were just the handwritten version of typewritten reports and progress notes already in the file. After the ALJ objected to the submission of documents that were already present in the exact same format in the file, counsel's assistant made an attempt to identify at least some of the duplicates, and the additional medical records were received. At the same time, counsel also tendered a summary of Carey's medical records, explaining what Carey expected they would show.

The ALJ then expressed concern about whether there would be sufficient time for the medical expert to review the new documents, framing the issue in terms of whether it would be fair to Carey to proceed. Although counsel did not form any objection to

7

proceeding, the ALJ refused to proceed until an off-the-record discussion with the medical expert confirmed that he would be able to review the newly submitted documents prior to his testimony later in the hearing. Having received that assurance, the ALJ permitted the hearing to proceed, and the following facts were developed.

## V.

Carey testified that he became unable to work on February 15, 1985 as a result of impairments arising from a 1971 back injury and subsequent back surgery, and from his electrocution on the job in 1983.

The bulk of the testimony and all of the medical records relate specifically to Carey's electrocution. The record reflects that on November 17, 1983, Carey was jolted with 12,000 volts of electricity when a beam he was holding on a construction site came into contact with a power line. The electrical current entered his left forearm and exited his left thigh, leaving a 6 to 8 inch exit wound on the front of his left thigh. Carey was treated at Hermann Hospital in Houston, Texas, and the record contains the medical records relating to his treatment immediately following the accident.

Laboratory work performed on the date of his injury revealed areas of focal necrosis in Carey's left forearm and thigh, as well as mild muscle damage in both areas. Several efforts were made to

treat Carey's serious injuries by less drastic means, but by November 25, 1983, necrosis of the muscle and the immediate threat of serious infection required that the doctors amputate Carey's left forearm and hand. Carey's forearm was amputated about three inches below the elbow. Doctors also performed a split thickness skin graft on the thigh wound at that time. On December 5, 1983, Carey was discharged with pain medication and an antibiotic.

Two days later, on December 7, 1983, Carey was admitted to the Texas Institute of Rehabilitation and Research complaining of phantom pain in the amputated limb. Carey also expressed an interest in training for an artificial limb. The initial TIRR assessment reports that Carey was continuing to take pain medication, but was not in any acute distress. The assessment further reflects that the skin graft on Carey's thigh was well-healed and that strength in the lower left extremity was not compromised at that time.

While at TIRR, Carey received wound care, physical therapy, and training in handling ordinary tasks with one hand. Progress notes reflect that Carey was regaining a good range of motion in the affected joints and that he was developing an increasing independence in one-handed activities. Progress notes also reflect that Carey continued to suffer from phantom pains, characterized as a tightening with pain in the amputated forearm and hand. On December 16, 1983, Carey was discharged from TIRR with pain medication in a condition characterized as medically stable.

9

Discharge notes reflect that Carey had completed the pre-prosthetic program and that he was to return for prosthetic training once the arm was sufficiently healed that it could be prepared for prosthetic casting.

Carey returned to TIRR on several occasions over the next few months. Progress notes prepared by TIRR's physical therapy department in December 1983 and January 1984 reflect that Carey enjoyed a full range of motion in the affected joints, and that Carey was asked to wear compressor bandages to shrink the distal end of the amputated limb for prosthetic casting.

Progress notes from this period also reflect some concern about Carey's thigh wound. On January 4, 1984, Carey was referred to TIRR's plastics clinic to determine whether additional skin grafting would be required on the thigh wound. Progress notes prepared by the plastics clinic reflect that there had been some breakdown of the initial skin graft to Carey's thigh, and some further complications with respect to the healing of that wound. TIRR physicians informed Carey at that time that "debridement and full thickness skin graft would allow him to close this wound and get on with his life style [sic] in a much faster manner." Carey declined additional surgery, however, and the physicians agreed that this was an acceptable choice.

Progress notes from later in January 1984 reflect that Carey continued to suffer from phantom pain in the amputated forearm and hand, and that physicians were continuing to work with Carey on

10

maintaining a full range of motion, decreasing sensitivity in the remainder of the amputated limb, and preparing the limb for prosthetic casting. Progress notes from February 1984 reflect that Carey was achieving some success with respect to shrinking the distal end of the amputated limb for prosthetic casting. On February 20, 1984, Carey was discharged from physical therapy and referred to a prosthetics company and the occupational therapy department for prosthetic training.

Carey was seen by TIRR's occupational therapy department on several occasions, beginning in March 1984 and continuing until at least August 1984. Progress notes from March 1984 reflect that Carey enjoyed a "good innate ability" for deciding how to approach a task and then accomplishing it using the prosthesis. Carey reported using the prosthesis to cut meat and that he knew how he would use the prosthesis to hold his gun when hunting. Progress notes from April 1984 report that Carey's prosthesis fit well and that he was wearing it an average of three hours per day. The notes further reflect that any problem with sweating under the prosthesis could be reduced with the addition of air holes for circulation. Progress notes from May 1984 report that Carey was wearing the prosthesis all day with no problems, aside from occasional mild swelling with weather changes.

In July 1984, Carey was referred to a TIRR vocational expert after his employer refused to rehire him. In September 1984, the vocational expert made a vocational assessment. The TIRR

11

vocational expert noted that Carey could stand and walk functionally, although he still experienced weakness in his left leg from the exit wound. The vocational expert further noted that Carey was able to wear the prosthesis for ten hours per day, that his skills with the prosthesis were good, and that he was independent in all of the activities of daily living. Based on these and other factors, the vocational expert concluded that "the outlook for continued employment is very good." Carey planned to return to his prior employment, and the vocational expert specifically recommended that Carey continue employment in the construction industry as a flagger. Around this time, Carey returned to work in the construction industry. Social security records reflect that his total earnings in the final months of 1984 were slightly more than his total earnings in the eleven pre-accident months of 1983.

## VI.

In February 1985, Carey stopped working. When asked directly why he stopped work, Carey twice testified that he was unable to do the walking and climbing necessarily required by the construction job because of weakness in his leg caused by the electrocution. Carey also testified that extreme temperatures, either hot or cold, made wearing the prosthesis a problem. Carey testified that he did not seek other work because he had spent twenty years in the construction industry and did not know any other trade. Carey did

12

not testify that he attempted any other type of work, aside from a brief period of a few weeks when he worked as a consultant for his neighbor.

Carey also offered testimony relating to the number and extent of his other impairments. Carey testified that he is affected by complications arising from his back injury. Specifically, Carey testified that one of his legs tends to go to sleep and become numb with prolonged sitting, and that he suffers from painful muscle spasms. Carey testified that the circulation in the remainder of his amputated limb is poor. Blood circulating into the stump tends to pool there, which causes severe pain that can only be alleviated by elevating the arm and taking over-the-counter pain medication. The stump also tends to bruise easily and to develop sores or boils as a result of poor circulation. These facts, together with the absence of any perforations for circulation in the prosthesis, make wearing the prosthesis difficult and working with it almost impossible. Carey also testified that he continues to suffer from phantom pain in the amputated forearm and hand.

Carey further testified with regard to other, more general problems arising from the electrocution. Carey testified that he suffers from digestive problems, and that he experiences debilitating headaches three to four times per week. Carey further testified that he has become irritable and ill-tempered, that he has trouble concentrating, and that he experiences depression associated with the loss of his limb and his inability to work.

13

Carey testified that these conditions were present on March 29, 1991, the date he was last insured for purposes of the Social Security Act, and that they have worsened only slightly since that time.

## VII.

One of the primary difficulties with this case arises from the absence of objective medical records to support Carey's subjective characterization of the extent of his impairments. *See* 20 C.F.R. § 404.1513(a) ("We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)."). There are no medical records relating to Carey's back injury and subsequent surgery, aside from anecdotal accounts of that injury given as part of his medical history upon the occasion of his electrocution. While there are medical records relating to Carey's electrocution and subsequent course of medical treatment over the next nine or ten months, there were no medical records or findings before the ALJ relating to Carey's condition after that time. Thus, there are no medical records demonstrating that Carey's wounds did not heal within the twelve month defining period for disability or that continuing problems arising from his injuries made it impossible for him to work after that point. To the contrary, the last TIRR records indicate that a vocational expert considered Carey capable of returning to his job. Similarly, there are no records of any medical consultation or

14

treatment by any physician or health provider within the relevant time frame of February 15, 1985, through March 31, 1991 (or indeed, through the February 1996 administrative hearing), aside from a letter reporting that Carey enjoyed 20/20 vision. In fact, Carey's own testimony establishes that he did not seek medical treatment for any of the impairments he now identifies as contributing to his inability to work, aside from the treatment associated with the initial injury and healing process, which ended in late 1984. Instead, Carey testified that he is able to alleviate any pain with over-the-counter medications, by resting the affected leg, and by elevating the remainder of his amputated limb to improve circulation. Finally, Carey did not seek treatment for and there are no medical records supporting Carey's claims that continuing pain, poor digestion, short temper, inability to concentrate, or depression contribute to his inability to work.

Given the dearth of medical evidence to support Carey's claimed impairments, and Carey's subjective complaints of pain, the ALJ solicited the testimony of a medical expert who offered testimony concerning the extent to which Carey's subjective complaints were borne out in the medical records. *See* 20 C.F.R. § 1527(f). The medical expert confirmed that he had reviewed all of the necessary medical records. The medical expert testified that there were no medical records supporting Carey's claim that he suffered any ongoing complications from the 1971 back injury. With

15

regard to the electrocution, the medical expert testified that there were no medical records suggesting that Carey's wounds had not healed within twelve months, or that he continued to suffer from pain or disabling physical complications from his injuries within the relevant time period of February 15, 1985, through March 29, 1991. To the contrary, the medical expert noted that the medical records indicated that Carey regained a full range of motion in the affected joints after the amputation and good use of the prosthetic device. The medical expert, likewise, noted that there was no medical support in the record for Carey's more generalized claims, such as his claim that he suffered from headaches, digestive problems, or depression. All of this testimony comports with the medical records reviewed by this Court.

The medical expert also testified, however, that there was no medical evidence: (1) that Carey experienced any complications arising from delayed healing of the left leg exit wound; (2) that Carey experienced any significant degree of muscle damage in the left leg; (3) that Carey's physicians recommended a full thickness skin graft; or (4) that Carey suffered from phantom pains in the amputated forearm and hand. The parties agree that the medical expert's testimony with respect to these last four points was not entirely correct, at least when limited to the period immediately following Carey's electrocution in 1983 and 1984.

Based on his assessment of the medical record, the medical expert concluded that Carey should be able to work on his feet for

six or more hours per day, and that Carey should be able to bend and stoop for up to one-third of the time in an ordinary work day. The medical expert did allow, however, that Carey would need to work in a climate controlled environment given the sensitivity of the remainder of the amputated limb and the problems associated with wearing the prosthesis in extremely hot or cold temperatures.

Carey, on the other hand, testified that, as of March 1991, the cumulative effect of his various impairments was that he could stand for only thirty minutes and sit for only forty-five minutes without resting. Carey testified that he could lift approximately fifty pounds with his left arm, and that he could lift much lighter loads with his prosthesis, provided that the lifting was accomplished in a straight arm down position. Carey further testified that he still enjoyed fishing and that he was capable of loading the fishing boat on and off the trailer.

## VIII.

The ALJ also solicited the testimony of a vocational expert. As is usual in such cases, the ALJ posed hypothetical questions to the vocational expert, asking the expert to address the claimant's residual functional capacity for work in light of a given set of limitations or impairments. The ALJ posed three hypothetical questions to the vocational expert. In one hypothetical, the ALJ incorporated the medical expert's opinion, framing the question in terms of a person who could sit, stand, and walk for six hours and

17

stoop or bend for up to one-third of the day, who was able to work with only one, dominant arm, who could not climb, and who would need to work in a climate controlled environment. The vocational expert testified that such a person would not be able to perform Carey's past relevant work, but that such a person would retain the residual functional capacity to perform certain light, unskilled, and available jobs such as usher, cashier, or ticket seller. In a second hypothetical, the ALJ incorporated most of Carey's own assessment of his disability in March 1991, framing the question in terms of a person who could walk only one block, stand for about thirty minutes, sit for between thirty and forty-five minutes without resting, and do some lifting with the dominant arm only, but could not do any climbing or overhead lifting, and would need to work in a climate controlled environment. The ALJ excluded from this hypothetical those impairments claimed by Carey that were not supported by any medical evidence, including Carey's allegations of poor digestion, trouble concentrating, ill-temper, and depression. The vocational expert testified that such a person would likewise be unable to perform Carey's past relevant work, but that such a person could perform certain light, unskilled, and available jobs such as cashier or ticket seller. The final hypothetical was the same as the second, but also included Carey's subjective and undocumented complaints of depression, poor digestion, ill-temper, and irritability, as well as an additional limitation posed by the ALJ of difficulty getting along with others. The vocational expert

18

testified that such a person should still be able to do the jobs of cashier and ticket seller, but that getting along with others might become an important factor in a job which requires contact with the public.

Acknowledging that Carey had additional impairments that might preclude him from performing a significant number of light, unskilled jobs, the ALJ prudently asked the vocational expert to directly address the effect of Carey's amputation on his ability to perform the identified jobs of usher, cashier, and ticket seller. The vocational expert testified that the identified jobs could be performed with the use of only one arm and hand. The vocational expert likewise confirmed that such jobs are available in significant numbers.

## IX.

In April 1996, the ALJ issued a decision denying benefits. The ALJ began the decision with an entirely accurate description of the medical records presented to the ALJ. The ALJ then noted the medical expert's testimony that the available medical records indicated that Carey had regained good use of the joints affected by the amputation and that he had not suffered any significant loss of function in his leg. The ALJ also noted the medical expert's testimony that there were no medical records suggesting that Carey's electrocution injuries did not heal within twelve months

19

after the accident.  The ALJ found this testimony, which is not challenged by Carey in this appeal, to be credible.

The ALJ also found that all of Carey's subjective complaints of impairment were credible to the extent they were supported by the objective evidence in the medical records.  Thus, the ALJ accepted Carey's characterization of his residual functional capacity for work in March 1991, including the limitations Carey described for walking, standing, and sitting.  The ALJ also accepted additional limitations upon Carey's residual functional capacity as developed by the evidence.  For instance, the ALJ found that Carey would need to work in a climate controlled environment. The ALJ rejected Carey's subjective complaints of impairment to the extent they were not supported by the objective medical evidence. For instance, the ALJ held that there was no objective medical evidence to support Carey's claim of depression or pain within the relevant time period of February 1985 through March 1991.  The ALJ was particularly persuaded by the facts that Carey, by his own testimony, had returned to work for a significant period of time following his injury and still enjoyed a fairly active lifestyle that was consistent with work at some level.  The ALJ was likewise persuaded by the fact that there were no medical records relating to Carey's condition in the relevant time frame, as opposed to the period immediately following his injury, and that, indeed, Carey conceded he had not sought such treatment.  Based upon all of the evidence, the ALJ concluded that Carey retained the residual

functional capacity to perform light work, but that Carey's residual functional capacity was compromised by the inability to use the left arm, the inability to climb, the inability to perform more than occasional bending or stooping, and the need to work in a climate controlled environment.

The ALJ noted that Carey's medical-vocational profile at least superficially approximated that set forth in Medical-Vocational Guideline 202.21. *See* 20 C.F.R. Part 404, Subpart P, App. 2. The ALJ acknowledged, however, that Carey's additional limitations would impact the number of light, unskilled jobs which he could perform. The ALJ stated that the vocational expert was called for the purpose of addressing whether there were available, light, unskilled jobs that Carey could perform. The ALJ then noted the vocational expert's testimony that Carey, in light of all of his impairments, could perform the jobs of cashier or ticket seller, and that those jobs were available in significant numbers in the national economy. The ALJ thus concluded that Carey was not disabled within the meaning of the applicable statutes and regulations.

Carey appealed the ALJ's decision to the Appeals Council, which affirmed.[1] This appeal ensued.

---

[1]While the case was pending before the Appeals Council, Carey submitted additional evidence in the form of a 1997 letter from a physician that treated Carey when he was electrocuted, but had not seen him regularly since. The Appeals Council found that the letter did not present any basis for reversing the ALJ's decision, and we agree. As an initial matter, the letter was drafted after

**X.**

On appeal, Carey argues that the ALJ's decision was not supported by substantial evidence. Carey first argues that the ALJ should not have relied upon the medical expert's testimony because that expert gave an inaccurate summary of Carey's medical records. Carey next argues that the ALJ should not have relied upon the vocational expert's testimony because the hypothetical questions posed to the vocational expert for the purpose of determining whether Carey could perform other gainful employment included, and were premised upon, the medical expert's inaccurate summary of Carey's medical records. Carey frames these issues in terms of the ALJ's failure to fully and fairly develop the administrative record.

An administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits. *See* *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984). This Court will not reverse the

---

the ALJ's decision and relates to Carey's current condition, rather than his condition in March 1991. Of equal importance, we note that the letter does not purport to set forth any clinical findings, but merely recounts Carey's current characterization of his impairments and then concludes that Carey, in the opinion of the physician, is disabled. Assuming arguendo that the 1997 letter is relevant, its probative weight is minimal and does not undermine the ALJ's decision in this case. *See* 20 C.F.R. § 220.46 (d) ("A treating physician is a doctor to whom the claimant has been going for treatment on a continuing basis"; "medical evidence provided by a treating physician will be considered," but a "statement by or the opinion of the claimant's treating physician will not determine whether the claimant is disabled.").

22

decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. *See* **Brock**, 84 F.3d at 728; **Kane**, 731 F.2d at 1220. To establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result." **Kane**, 731 F.2d at 1220.

We agree with Carey that the medical expert's testimony, standing alone, raises some cause for concern. The medical records relating to Carey's immediate treatment after injury include laboratory tests showing a focal area of necrosis and some muscle damage to Carey's thigh, although that damage is characterized as mild. The medical records relating to Carey's post-injury treatment at TIRR reflect that the thigh wound was not healing well, that the initial skin graft was breaking down, and that TIRR physicians specifically recommended a full thickness skin graft to speed the healing process. Likewise, there is plenty of evidence in the medical record to support Carey's subjective claim of phantom pain in the amputated forearm and hand. Carey was prescribed medication for pain when he was discharged from Herman Hospital in November 1983, and when he was discharged from TIRR after his initial stay in December 1983. Thus, to the extent the medical expert's testimony can be seen to be in conflict with this evidence, it was not reflective of Carey's true condition at the time he was treated for his injuries in 1983 and 1984.

We are not, however, persuaded that these inaccuracies present reversible error in this case. First of all, there is no indication in this record that the ALJ accepted or relied upon the objectionable portions of the medical expert's testimony. Carey's counsel stated at the hearing that most of the medical records submitted at the hearing were merely duplicative of information already contained in the social security file. Carey's counsel had thoroughly reviewed the relevant records and had even prepared a summary of the medical records, which was presented to the ALJ. Thus, the ALJ had both accurate medical records and Carey's interpretation of the medical records available when the medical expert testified and when the ALJ issued her decision.

Carey argues that the ALJ's reliance upon the medical expert's inaccurate testimony is evident in the hearing transcript. Specifically, Carey objects that the ALJ's hypothetical questions to the vocational expert were premised upon the medical expert's inaccurate summary of his medical records. We disagree. Carey is correct that one of the three hypothetical questions posed to the vocational expert was premised upon the medical expert's characterization of Carey's residual functional capacity. But the ALJ also posed two additional hypothetical questions to the vocational expert, both of which were premised upon Carey's own testimony about his residual functional capacity. Thus, the hearing transcript reflects nothing more than that the ALJ considered the medical expert's testimony.

24

Carey likewise suggests that the ALJ's reliance upon the medical expert's testimony is evident in the ALJ's decision. Specifically, Carey points to the ALJ's finding that the medical expert gave credible testimony. Once again, we disagree. While it is true that the ALJ made a finding that the medical expert's testimony was credible, that finding was limited to the medical expert's testimony (1) that there was no medical evidence indicating that Carey's wounds did not heal within twelve months of the electrocution, and (2) that the available medical records relating to Carey's post-injury progress indicated that Carey regained good use of the affected joints and extremities.

The ALJ did not make any such finding of credibility with respect to the testimony that Carey identifies as objectionable in this appeal. To the contrary, the ALJ's decision begins with a detailed and entirely accurate summary of Carey's medical records. Moreover, the ALJ rejected the medical expert's characterization of Carey's residual functional capacity, adopting the exertional limitations identified by Carey instead. To the extent the ALJ rejected Carey's claims of non-exertional limitations, that decision was plainly premised upon the complete absence of any objective medical evidence to support Carey's claims, rather than upon any erroneous testimony from the medical expert. *See* 20 C.F.R. § 404.1513(a). The ALJ was particularly persuaded by the facts that Carey had not sought and did not require any medical

25

intervention for the severe impairments he claimed, and that, as of March 1991, Carey was still functioning well with many daily and recreational activities that were consistent with some level of gainful employment.

We conclude that neither the hearing transcript nor the ALJ's decision reflect any unjustified reliance upon inaccurate testimony from the medical expert. Likewise, there is no indication that the vocational expert's testimony was limited in any significant manner by inconsistencies or inaccuracies in the medical expert's testimony. Of equal importance, the record evidence is ample to support the ALJ's credibility determinations and other findings with respect to Carey's impairments and his residual functional capacity, without regard to the objectionable portions of the medical expert's testimony. For these reasons, we conclude that Carey was not prejudiced by any inconsistency between the medical expert's testimony and the medical records submitted to the ALJ. *See* **Brock v. Chater**, 84 F.3d 726, 729 (5th Cir. 1996) ("We will not reverse the decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges.").

## XI.

Carey also argues that the ALJ's decision was not supported by substantial evidence because the vocational expert's testimony that Carey could perform certain identified jobs with only one arm is in

26

conflict with the description given those jobs in the Department of Labor's Dictionary of Occupational Titles (DOT).

There is a circuit conflict on the issue of whether an ALJ may rely upon the testimony of a vocational expert when that expert's testimony is either in conflict with or creates a conflict in the evidence in light of DOT provisions.[2]   The Sixth and Eleventh Circuits hold that a vocational expert's testimony is substantial evidence that the ALJ may rely upon, even when that testimony is in conflict with DOT provisions.  *See* ***Jones v. Apfel,*** 190 F.3d 1224

---

[2]We note that a vocational expert's testimony may give rise to such a conflict in at least two different ways.  First, the vocational expert may testify that a particular job requires a particular exertional or skill level, when the DOT expressly provides that the job requires a different exertional level. *See, e.g.,* ***Conn v. Secretary of Health & Human Servs.***, 51 F.3d 607, 610 (6th Cir. 1995) (vocational expert testified that particular jobs required only a sedentary exertional level, while the DOT classified those same jobs as light or medium).  With this most direct and obvious type of conflict, the ALJ is asked to accept the vocational expert's testimony, even though that testimony is in actual conflict with the provisions of the DOT, which is routinely relied upon by the responsible agency.  A second, and different type of conflict may arise when the vocational expert's testimony places the ALJ's finding with respect to the claimant's residual functional capacity or the claimant's specific impairments in conflict with the exertional or skill level or the specific skills required for the identified jobs in the DOT. *See, e.g.,* ***Haddock v. Apfel***, 196 F.3d 1084, 1087-88 (10th Cir. 1999)(vocational expert testified that claimant could perform three jobs classified by the DOT as requiring a light or heavy exertional level after the ALJ found that claimant had the residual functional capacity for only sedentary work)*;* ***Johnson v. Shalala***, 60 F.3d 1428 (9th Cir. 1995) (vocational expert testified that claimant could perform a job classified by the DOT as light, notwithstanding the ALJ's determination that the claimant retained the residual functional capacity for only sedentary work).  The existing precedent encompasses both types of conflict.

27

(11th Cir. 1999), *cert. denied*, 120 S. Ct. 1723 (2000); **Conn v. Secretary of Health & Human Servs.**, 51 F.3d 607 (6th Cir. 1995). The Fourth Circuit has reached the same result in an unpublished case. *See* **Sawyer v. Apfel**, No. 98-1520, 1998 WL 830653 (4th Cir. Dec. 2, 1998). These courts reason that social security regulations do not require the ALJ or the vocational expert to rely upon the classifications in the DOT, or that the categorical DOT job descriptions are neither comprehensive nor exclusively probative of a claimant's ability to perform a particular job. *See, e.g.,* **Jones**, 190 F.3d at 1229-30; **Conn**, 51 F.3d at 610; **Sawyer**, 1998 WL 830653, at *1; *see also* **Fields v. Bowen**, 805 F.2d 1168 (5th Cir. 1986) (relying upon the necessarily general nature of DOT job descriptions to hold that the Dictionary of Occupational Titles is not an adequate substitute for vocational expert testimony or other similar evidence on the issue of whether a claimant can perform other gainful employment.)

The Eighth Circuit clearly holds that an ALJ may not rely upon the testimony of a vocational expert if the expert's testimony conflicts with the DOT. *See* **Smith v. Shalala**, 46 F.3d 45 (8th Cir. 1995) (involving a vocational expert's testimony that the claimant could perform a particular job which, according to the DOT required the ability to lift between twenty and fifty pounds, notwithstanding the ALJ's determination that the claimant could not lift more than twenty pounds). The Eighth Circuit reasons that, in

28

the case of such a clear conflict, the DOT job descriptions are generally more reliable than the conflicting testimony of a vocational expert, at least with respect to the skills required to perform a particular job. *See* **Smith**, 46 F.3d at 46 (noting the authoritative nature of the DOT and the fact that the experience level and knowledge of vocational experts may vary greatly).

The Ninth and Tenth Circuits employ a middle ground position, holding that, when the vocational expert's testimony is either in conflict with the DOT or creates a conflict in the evidence based upon the DOT, the ALJ may, nonetheless, rely upon the vocational expert's testimony if the record reflects a substantial reason for deviating from the DOT. *See* **Haddock v. Apfel**, 196 F.3d 1084 (10th Cir. 1999); **Johnson v. Shalala**, 60 F.3d 1428 (9th Cir. 1995). The Second and Seventh Circuits have issued arguably consistent opinions. *See* **Tom v. Heckler**, 779 F.2d 1250 (7th Cir. 1985) (remanding for further exploration of an apparent conflict between the ALJ's finding that claimant was limited to sedentary work and the vocational expert's testimony that the claimant could perform certain jobs classified at light in the DOT); **Mimms v. Heckler**, 750 F.2d 180, 186 (2d Cir. 1984) (same).[3]

---

[3] In a much more recent, but unpublished decision, the Seventh Circuit explained that the DOT is not controlling and that the ALJ may rely upon the testimony of a vocational expert, even when it is inconsistent with the DOT. *See* **Mont v. Chater**, No. 96-2896, 1997 WL 201626 (7th Cir. Apr. 4, 1997) (unpublished) (citing **Conn v. Secretary of Health & Human Servs.**, 51 F.3d 607 (6th Cir. 1995)).

Our own Circuit has not addressed when a conflict exists or how such a conflict is to be resolved. We have, however, refused to uphold a determination of disability when premised solely upon DOT job descriptions, rather than upon the testimony of a vocational expert or other similar evidence. *See Fields*, 805 F.2d at 1170-71. When, as here, the claimant suffers from additional limitations that make the Medical-Vocational Guidelines inapplicable, the Commissioner must rely upon the services of a vocational expert or similar evidence. *Id*. This Court has recognized that the DOT is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job. *Id*. at 1171. "The value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id*. at 1170; *see also Vaughan v. Shalala*, 58 F.3d 129 (5th Cir. 1995). Thus, although this Court has not addressed when there is a conflict between the testimony of a vocational expert and the DOT and how that conflict is to be resolved, this Court has acknowledged that the DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job.

Having set forth those general principles, we turn to

consideration of the conflict alleged here. The ALJ solicited the assistance of a vocational expert because Carey suffered from additional impairments which potentially precluded Carey from performing a significant number of light, unskilled jobs, and made application of the Medical-Vocational Guidelines inappropriate. The ALJ posed a hypothetical question to the vocational expert which included all of the limitations identified by Carey that were supported by any objective medical evidence. *See, e.g.*, 20 C.F.R. § 404.1513(a); **Bowling v. Shalala**, 36 F.3d 431, 435-36 (5th Cir. 1994). The ALJ determined that Carey retained the residual functional capacity to perform light, unskilled work, as limited by the inability to use the left arm and hand, the need to have a sit-stand option to accommodate Carey's limitations in that regard, and the need to work in a climate controlled environment. The vocational expert testified that Carey, in light of the impairments found by the ALJ, could perform the job of cashier or ticket taker. Both of those jobs are light, unskilled jobs, and the vocational expert specifically testified that Carey could perform both jobs with the additional impairments identified by the ALJ.

On appeal, Carey claims that the vocational expert's testimony that he could work as a cashier or ticket seller with one arm and hand is incredible in light of or inconsistent with the skill requirements listed for those jobs in the DOT. Specifically, Carey notes that both jobs require handling and fingering for between

31

one-third and two-thirds of the day, finger dexterity in the middle third of the population, and manual dexterity within the lowest third of the population, excluding the bottom ten percent. As an initial matter, we note that this case does not involve the type of direct and obvious conflict at issue when the vocational expert's characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill level provided for that job in the DOT. Neither does this case involve the less obvious conflict created when the vocational expert's testimony creates a conflict or discrepancy between the ALJ's determination of the claimant's residual functional capacity and the DOT job descriptions. The vocational expert characterized the jobs of cashier and ticket seller as light, unskilled jobs, which comports with both the DOT and the ALJ's determination of Carey's residual functional capacity. What is involved here is merely an alleged conflict between the vocational expert's specific testimony that Carey could perform the jobs of cashier and ticket seller with one hand, and a DOT description stating that the person in those jobs will be required to have some ability to finger and handle things. The conflict identified by Carey does not even become apparent until the further inference is made that the jobs require manual dexterity with, not one, but two hands. Moreover, that conflict is greatly mitigated by the vocational expert's specific testimony that Carey could perform the identified jobs with only one arm and hand. Carey, nonetheless, maintains that the

32

vocational expert's testimony should have included some explanation of why the identified jobs could be performed with only one arm and hand.

We are not persuaded that the facts of this case present any actual conflict between the vocational expert's testimony and the DOT. The DOT does not contain any requirement of bilateral fingering ability or dexterity, and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm and hand. Moreover, Carey's counsel was given an opportunity to object or cross-examine the vocational expert on the affect of Carey's amputation on his ability to perform the identified jobs. *See Bowling*, 36 F.3d at 435-36. Nonetheless, Carey's counsel did not raise the issue or challenge the vocational expert's testimony that the jobs of cashier and ticket seller could be performed with only one arm and hand. Carey basically contends that the vocational expert's testimony that he could perform certain jobs requiring manual dexterity in the lowest third of the population should have been explored further, when Carey himself failed to do so in the administrative hearing.

Given the tangential nature of the conflict alleged here, we surmise that Carey's argument actually reduces to a factual disagreement about whether a person with one arm can perform a job requiring some degree of manual dexterity and fingering. The

regulatory structure as well as the controlling precedent requires expert testimony on such issues, and there is no indication in this record that the vocational expert's testimony that Carey could perform those jobs with one arm and hand was incorrect. Our task in these cases is merely to determine whether the Commissioner's determination is supported by substantial evidence. We are not permitted to "reweigh the evidence in the record, try the issues de novo, or substitute" our own judgment for that of the Commissioner, or even the testifying witnesses. *See* **Brown**, 192 F.3d at 496.

To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT in this case, we agree with the majority of the circuits that the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. As the facts of this case demonstrate, all kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. Adopting a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling,

34

permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs. Certainly, a vocational expert's erroneous characterization of the exertional level or skills required to perform a particular job calls into question both the probative value and reliability of the expert's testimony. Likewise, an explained discrepancy between the ALJ's determination of the claimant's residual functional capacity and the vocational expert's testimony that the claimant can perform certain identified jobs with inconsistent skill requirements may require remand for further exploration. But in this case, the vocational expert's clear and unchallenged testimony that Carey could perform the identified jobs with one arm and hand is adequate, in the context of this record as a whole, to support the ALJ's determination that Carey could perform other available work. We, therefore, decline to reverse the Commissioner's determination on the basis of the implied conflict between the vocational expert's testimony and the DOT.

## XII.

Carey's final argument is that the ALJ's determination that he was not disabled as of March 1991 is premised upon an erroneous application of the controlling legal principles. Specifically, Carey contends that the ALJ erroneously relied upon Medical-

Vocational Guideline 202.21 when determining that Carey could perform other gainful employment, even though Carey's medical condition did not correspond to the terms of that guideline.

Medical-Vocational Guideline 202.21 provides for a finding of no disability when an individual with a residual functional capacity for light work is aged 45 to 49, has at least a high school education, and has skilled or semi-skilled work experience that is not transferrable. *See* 20 C.F.R. Part 404, Subpart P, App. 2. Use of the Medical-Vocational Guidelines is not appropriate when the claimant has non-exertional limitations, such as Carey's requirement for a climate controlled environment. *See **Loza v. Apfel***, 219 F.3d 378, 398 (5th Cir. 2000). We, therefore, agree with Carey that reliance upon those guidelines to determine whether he was disabled would be inappropriate. We, nonetheless, decline to find legal error in this case because the ALJ did not make her disability determination on the basis of the Medical-Vocational Guidelines. While it is true that the ALJ twice mentioned the similarity between Carey's vocational-medical profile and Medical-Vocational Guideline 202.21 in her decision, the ALJ went on to note that Carey's additional impairments required further evidence. Thus, the ALJ's decision reflects both an understanding of the inadequacy of the guideline and the need for vocational expert testimony to develop the issue further. The ALJ expressly relied upon the vocational expert's clarifying testimony for her ruling

that Carey, with his particular impairments, could perform certain sedentary or light jobs that are available in significant numbers in the national economy.  There is, therefore, no legal error in the ALJ's ruling.

## CONCLUSION

The district court is in all respects AFFIRMED.

ROBERT M. PARKER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that when a vocational expert's testimony is in conflict with the DOT, the ALJ may rely on the vocational expert's testimony if the record reflects a substantial reason for doing so. *See Haddock v. Apfel*, 196 F.3d 1084 (10th Cir. 1999). Although the DOT is due deference, it does not and cannot cover every possible permutation of human impairment. A vocational expert's testimony that, in a particular case, a claimant can or cannot perform a specific job or class of jobs must be taken into consideration by the ALJ. I therefore agree that we should decline to reverse the Commissioner's determination on the basis of the conflict between the vocational expert's testimony and the DOT.

However, I find merit in Carey's claim that the ALJ's decision was not supported by substantial evidence. The medical expert gave an inaccurate summary of Carey's medical records, the vocational expert's testimony relied, in part, on that inaccurate summary and the ALJ specifically found that the medical expert gave credible testimony. The ALJ was clearly in error when he relied on Medical Vocational Guideline 202.21, a fact that the majority acknowledges. Based on these errors, I would reverse this case and remand it for

a determination of Carey's eligibility for disability insurance payments in light of a complete and accurate record.

I respectfully dissent.