Larry S. WOODS, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration Defendant.

No. CIV.A. H–05–3207.

United States District Court, S.D. Texas, Houston Division.

Sept. 5, 2006.

Victor N Makris, Attorney at Law, Houston, TX, for Larry S. Woods, Plaintiff.

Scott Thomas Morris, SSA OGC, Dallas, TX, for Jo Anne B Barnhart Director Social Security Administration, Defendant.

## AMENDED MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Larry S. Woods' ("Woods") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("the Commissioner"), cross-motions for summary judgment. Woods appeals the determination of an Administrative Law Judge ("ALJ") that he is not entitled to receive Title II disability insurance benefits or

Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is ordered that Woods' Motion for Summary Judgment (Docket Entry No. 8) is granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 9) is denied, the ALJ's decision denying benefits is reversed, and the case is remanded, pursuant to sentence four, to the Social Security Administration ("SSA") for further proceedings.

## I. *Background*

Woods filed an application for disability insurance benefits and supplemental security income with the SSA on June 4, 2002, claiming that he had been disabled and unable to work since August 31, 2001. (R. 150–152, 787–789). Woods alleged that he suffers from a variety of disabling conditions, including major depressive disorder,[1] a learning disability,[2] post traumatic stress disorder,[3] degenerative disk disease[4] of the lumbar and thoracic spine, Hepatitis C,[5] status post left shoulder injury, obesity,[6] cataracts, a left knee injury, arthritis in his neck and back, and a history of substance abuse. (26, 155). After being denied benefits initially and on reconsideration (R. 80–82, 113–115, 117–123), Woods requested a hearing before an ALJ. (R. 107).

A hearing was held on September 15, 2004, in Houston, Texas, at which time the ALJ heard testimony from Woods, George Lazar, M.D. ("Dr.Lazar"), a medical expert in the area of psychology, and Norman Hooge ("Hooge"), a vocational expert ("VE"). (R. 33–79). In a decision dated September 23, 2004, the ALJ denied Woods' applications for benefits. (R. 21–30). On November 22, 2004, Woods appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 8–17). On April 29, 2005, the Appeals Council denied Woods'

---

**1.** "Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any history or manic, mixed, or hypomanic episodes. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 530 (29th ed.2000).

**2.** "Learning Disorder" refers to a group of disorders characterized by academic functioning that is substantially below the level expected on the basis of the patient's age, intelligence, and education, interfering with academic achievement or other functioning. *See* DORLAND'S, *supra*, at 530.

**3.** "Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating. The onset of symptoms may be delayed for months to years after the event. *See* DORLAND's, *supra*, at 531.

**4.** "Degenerative disease" is a disease characterized by the progressive impairment of the function of an organ or organs and not attributable to some cause such as an infection or a metabolic defect. *See* GOULD'S MEDICAL DICTIONARY 363 (4th ed.1979).

**5.** "Hepatitis" refers to an inflammation of the liver. *See* DORLAND'S, *supra*, at 807. "Hepatitis C" refers to a viral disease caused by the hepatitis C virus, the most common form of post transfusion hepatitis; it also follows parenteral drug abuse and is a common acute sporadic hepatitis, with approximately 50 per cent of acutely infected persons developing chronic hepatitis. *See id.* at 808.

**6.** "Obesity" refers to an increase in body weight beyond the limitation of skeletal and physical requirement, as the result of an excessive accumulation of fat in the body. *See* DORLAND'S, *supra*, at 1251.

request to review the ALJ's determination. (R. 5–7). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Woods filed this case on September 13, 2005, seeking judicial review of the Commissioner's denial of his claim for benefits. *See* Docket Entry No. 2.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed.2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. *See Brown v. Apfel*, 192 F.3d 492, 495 n. 1 (5th Cir.1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, July 2002, fixes the earliest date from which benefits can be paid. Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social security disability insurance benefits are authorized by Title II of the Act and are funded by social security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir.1997). For purposes of Title II disability benefits, Woods was insured through the date of the ALJ's decision—September 23, 2004. (R. 29). Consequently, to be eligible for disability benefits, Woods must prove that he was disabled prior to that date.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the

same for both disability insurance benefits and SSI. *See Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

## B. *Standard of Review*

### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.,* 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo. See Merritt–Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.,* 199 F.3d 796, 798 (5th Cir.2000).

### 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson,* 309 F.3d at 272; *Brown,* 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson,* 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

## C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd v. Apfel,* 239 F.3d 698, 704–05 (5th Cir.2001). The claimant has the burden to prove disability under the first four steps. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001). If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan, v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's impairments are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decisions.

5. The claimant has the following residual capacity: the claimant can perform a range of light work. He cannot climb ladders or crawl. He can occasionally reach overhead with the left arm. He cannot perform detailed our [sic] complex tasks in a structured environment. He can have only occasional interaction with the general public. He cannot perform job tasks with high stresses, such as short deadlines or high quotas.

6. The claimant's past relevant work as a security guard did not require the performance of work-related activities precluded by his residual functional capacity. (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant's medically determinable impairments do not prevent the claimant from performing his past relevant work.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 29). Because the ALJ found that Woods could perform his past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

█ This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Woods' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater,* 64 F.3d 172, 174

(5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ, and not the Court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

### D. *Issues Presented*

Woods argues that the decision of the ALJ is not supported by substantial evidence and, furthermore, contains an error of law. Specifically, Woods contends that: (1) the ALJ failed to establish that Woods can perform his past work as a security guard; (2) the ALJ failed to adhere to the directive in Social Security Ruling ("SSR") 00–4p requiring him to resolve conflicts between the vocational expert's ("VE") testimony and the Dictionary of Occupational Titles ("DOT"); (3) the ALJ violated SSR 96–8p and 20 C.F.R. §§ 404.1521, 416.921 when he failed to provide a specific analysis of Woods' physical functional capacity on a function-by-function basis; and (4) the ALJ failed to address Woods' ability to not only initiate his work effort, but to sustain that effort over the course of a typical workday in light of his degenerative disk disease, obesity, and Hepatitis C. *See* Docket Entry No. 8, at 4–7. The Commissioner disagrees with Woods' contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 9.

### E. *Review of the ALJ's Decision*

#### 1. *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley,* 493

U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532, 110 S.Ct. 885; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir.2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza,* 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairments most similar to the claimant's most severe impairment. *See Zebley,* 493 U.S. at 531, 110 S.Ct. 885.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530–31, 110 S.Ct. 885; *Selders,* 914 F.2d

at 619. The listings describe a variety of physical and mental illnesses and abnormalities and are typically categorized by the body system they affect. *See Zebley,* 493 U.S. at 529–30, 110 S.Ct. 885. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530, 110 S.Ct. 885. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. See *id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a). The applicable regulations further provide:

(1)(i) If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A) You do not exhibit one or more of the medical findings specified in the particular listing, or

(B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii) We will nevertheless find that your impairment is medically equivalent to

that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley,* 493 U.S. at 531, 110 S.Ct. 885. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala,* 1 F.3d 357 (5th Cir.1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Woods' administrative hearing reveals that Woods suffers from a major depressive disorder, a learning disability, post traumatic stress disorder, degenerative disk disease of the lumbar and thoracic spine, status post left shoulder injury, obesity, Hepatitis C, and a history of substance abuse. (R. 26).

On October 2, 1991, Woods sustained a work-related injury after falling from a river barge. Magnetic resonance imaging studies revealed mild to moderate dehydration of the L5–S1 intervertebral disk[7] with a central and right-sided posterior anular[8] tear associated with minimal bulging of the posterior disk anulus. (R. 277–279). Subsequent follow-ups visits over the next two years record only intermittent improvement in his condition and continual pain in his back and legs. (R. 310, 366, 367, 375, 379, 387, 388, 396, 423).

On November 11, 1995, Tim Monroe, M.D. ("Dr.Monroe"), determined that Woods also suffered from over thirty years

---

**7.** An "invertebral disk" is a disk interposed between the bodies of adjacent vertebrae. *See* Stedman's Medical Dictionary 523 (27th ed.2000).

**8.** "Anular" means ring shaped. *See* Stedman's, *supra,* at 107.

of drug and alcohol abuse. (R. 254). While being treated at Houston Recover Campus on September 21, 2001, Woods confirmed long-term alcohol and drug abuse starting when he was a child. (R. 273–276). He also revealed that he had been recently treated for suicidal ideation. (R. 273–276). Doctors noted that he had an alcohol dependence with withdrawal symptoms and depressive and suicidal tendencies. (R. 273–276).

On December 17, 2001, Woods arrived in the emergency room after falling and injuring his left shoulder. (R. 466). X-rays revealed a fracture fragment adjacent to the inferior aspect of the glenoid.[9] (R. 461–466).

On February 8, 2002, at the request of the Texas Rehabilitation Commission, David McLendon, Ph.D. ("Dr.McLendon"), a psychologist, evaluated Woods and reported that Woods was an alcoholic and had a history of drugs abuse. (R. 439–446). Dr. McLendon administered a standardized intelligence test and Woods' scores attested to a performance I.Q. of 85, a verbal I.Q. of 91, and a full scale I.Q. of 88, which indicated that Woods functioned in the average to low average range of intelligence. (R. 439–443). Dr. McLendon also discovered developmental learning disorders. (R. 443). He diagnosed Woods with major depression, recurrent and mild; polysubstance dependence in early partial remission; alcohol dependence, in early partial remission; a disorder of written

expression; and, a mathematics disorder. (R. 443). Dr. McLendon, though, concluded that Woods' prognosis for successful rehabilitation and future employment was good. (R. 445). On November 21, 2002, while being treated at the Mental Health and Mental Retardation Authority ("MHMRA") of Harris County, he was diagnosed with major depressive disorder. (R. 602).

On February 25, 2002, Woods was treated at Casa de Amigos Clinic where tests confirmed a positive diagnosis of Hepatitis C. (R. 576). An abdomen ultrasound showed cholelithiasis[10] with evidence of cholecystitis.[11] (R. 573–576).

X-rays performed on March 4, 2002, showed a Bankhart fracture.[12] (R. 455–456). A magnetic resonance imaging ("MRI") study conducted on April 15, 2002, revealed a spiral fracture of the distal humerus at the intersection of the middle and distal 1/3. (R. 449–450). A review conducted by Stephanie Roberson, M.D. ("Dr.Roberson"), also showed a Hill–Sachs deformity[13] of the humeral head. (R. 449).

On August 21, 2002, Woods was treated at the Psychiatric Department of Ben Taub Mental Health Services after complaining of a decreased mood. (R. 643). He participated in group therapy and was discharged on August 29, 2002, with recommendations to follow-up at the Ben Taub Psychiatric Clinic. (R. 617–618).

---

9.  "Glenoid" denotes the articular depression of the scapula entering into the formation of the shoulder joint. *See* STEDMAN's, *supra*, at 749.

10. "Cholelithiasis" is the presence or formation of gallstones; they may be either in the gallbladder or in the common bile duct. *See* DORLAND's, *supra*, at 341.

11. "Cholecystitis" is an inflammation of the gall bladder. *See* DORLAND's, *supra*, at 340.

12. "Bankart lesion" refers to an avulsion of the anterior glenoid labrum following anterior dislocation of the shoulder. *See* DORLAND's, *supra*, at at 981.

13. "Hill–Sachs lesion" is a compression fracture of the posteromedial humeral head, sometimes occurring with anterior dislocation of the shoulder, caused by impaction of the humeral head on the anterior rim of the glenoid fossa. *See* DORLAND's, *supra*, at 981.

On October 7, 2002, Woods was examined by Manizeh Mirza–Gruber, M.D. ("Dr.Mirza–Gruber"), a psychiatrist. (R. 467–472). Despite that Woods complained of insomnia; increased weight; appetite disturbance; poor concentration; decreased energy; fatigue; feelings of helplessness, hopelessness, worthlessness and guilt; and some passive suicidal inclinations, Dr. Mirza–Gruber found that Woods was coherent, relevant, and logical and that his ability to cook, shop, and perform chores was fair. (R. 467–472). Dr. Mirza–Gruber also found that Woods had associations with family and friends. (R. 467–472). Dr. Mirza–Gruber diagnosed Woods with mood disorder, polysubstance abuse in complete remission, and a history of nonverbal learning disability. (R. 612–614).

On November 18, 2002, Woods was evaluated by Antonio Alvarez, M.D. ("Dr.Alvarez"). (R. 551–552). During this evaluation, Dr. Alvarez discovered that Woods had been in rehabilitation for addiction to alcohol, cocaine, and marijuana. (R. 551–552). Dr. Alvarez also found that Woods had significant limitation to rotation, internally and externally. (R. 551–552). Although he had no problem with abduction, adduction, or any other motion, lumbar x-rays showed mild degenerative changes involving the lower lumbar spine and moderate degenerative changes involving Woods' lower thoracic spine. (R. 551–552). X-rays of his left shoulder showed mild degenerative changes at the acromioclavicular joint. (R. 551–552).

On January 27, 2003, Woods was voluntarily admitted to the Harris County Psychiatric Center. (R. 589–593). He was treated for depression and was found to be compliant and tolerable of the medications. (R. 589–593). He was released on January 29, but, one day later, Woods checked in at MHMRA and admitted that he had not been compliant in taking his medications and also complained of hallucinations. (R. 597–600). Although MHMRA restarted him on his medication in July 2003, during that same month Woods stated that he had once again failed to take his medications and was again experiencing hallucinations. (R. 764–766).

On April 10, 2003, Jean Samaan, M.D. ("Dr.Samaan") evaluated Woods and opined that he was permanently disabled secondary to lumbar degenerative disk disease. (R. 770). On August 28, 2003, Dr. Samaan found that Woods was permanently disabled from work due to his mental and physical condition. (R. 773).

In November 2003, Dr. Gerald Scardino, M.D. ("Dr.Scardino"), evaluated Woods and found that he was disabled from work for six months due to his depression and recurrent psychotic features. (R. 771). On February 6, 2004, Dr. Scardino stated that Woods was receiving outpatient treatment and again diagnosed him with major depressive disorder, recurrent with psychotic features and post traumatic stress disorder. (R. 776).

On April 30, 2004, Woods reported that he was feeling better and that his medications had been effective. (R. 731–733). On May 28, 2004, M. Heatin, a clinical provider, noted that Woods could not work for six months due to his major depressive disorder. (R. 775).

#### 2. *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir.1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d

at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir.2001); *Scott v. Shalala,* 30 F.3d 33, 35 n. 2 (5th Cir.1994); *Falco,* 27 F.3d at 164; *Wren,* 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco,* 27 F.3d at 164 n. 18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen,* 862 F.2d 471, 481 (5th Cir.1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler,* 770 F.2d 1276, 1281–82 (5th Cir.1985)); *accord Chambliss,* 269 F.3d at 522 (citing *Houston v. Sullivan,* 895 F.2d 1012, 1016 (5th Cir.1989)); *Hampton v. Bowen,* 785 F.2d 1308, 1309 (5th Cir.1986).

■ As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames,* 707 F.2d at 166; *Epps v. Harris,* 624 F.2d 1267, 1274 (5th Cir.1980); *accord Brown v. Bowen,* 794 F.2d 703, 707 (D.C.Cir.1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan,* 887 F.2d 92, 96 (5th Cir.1989); *Owens,* 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss,* 269 F.3d at 522; *Johnson v. Heckler,* 767 F.2d 180, 182 (5th Cir.1985).

■ For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss,* 269 F.3d at 522; *Falco,* 27 F.3d at 163; *Wren,* 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss,* 269 F.3d at 522; *Wren,* 925 F.2d at 128; *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986). However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart,* 330 F.3d 670, 672 (5th Cir.2003) (citing *Wren,* 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Woods testified regarding his complaints of pain. (R. 38). The ALJ, however, determined that Woods' subjective complaints were not totally credible, were not corroborated by significant evidence, or were inconsistent with other evidence in the record. (R. 27, 29). The ALJ's decision indicates that he considered objective and subjective indicators related to the severity of Woods' pain:

A review of the evidence does not fully support the degree of pain and limitation alleged by the claimant. The claimant's physical complaints were somewhat exaggerated and not fully consistent with the medical record. When examined by Dr. Alvarez on November 18, 2002, the claimant had significant limitation of the shoulder, but he had no problem with abduction, adduction or any other motion. His right-side was normal, as well as the lower extremities. He had normal pulses and normal reflexes (Exhibit F, pages 280–282).

The claimant has not sought emergency care on a frequent basis for joint pain. The claimant testified to few daily activities, but his limitations seem to be self-

imposed, given the fact he has not documented that any doctor has requested he restrict his activities. His alleged limitations regarding sitting (only 15–20 minutes), standing (30 minutes) and other postural maneuvers are unsupported by the objective findings. The undersigned concludes that there is no objective or otherwise credible evidence that claimant is incapable of a range of light work. Thus, the undersigned finds the claimant's testimony to be unsupported by the objective findings and not credible to the extent alleged.

(R. 27–28).

■ Based on a review of the entire record, the Court does not doubt that Woods suffers from pain but, nonetheless, finds that the medical record does not support a finding that Woods' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss,* 269 F.3d at 522; *Falco,* 27 F.3d at 163; *Wren,* 925 F.2d at 128. Under clinical examination by Dr. Gruber, Woods' posture and gait were within normal limits, he was coherent, relevant and logical, and his serial threes were intact. (R. 612–614). He also has the ability to cook, clean, shop and perform chores. (R. 612–614). Just a month later, Dr. Alvarez found Woods had no apparent problems with abduction, adduction, or any other motion. (R. 551–552). Furthermore, despite a well-documented record of depression, including psychotic features and hallucinations, Woods has also been responsive to medications when he is compliant in taking them, indicating that Woods' condition is at least not wholly unresponsive to treatment. (R. 439–443).

Although three different doctors found Woods' mental and physical conditions created a permanent work disability, the ALJ is entitled to consider the credibility of the claimant and to weigh inconsistent evidence. *See Chambliss,* 269 F.3d at 522; *Dunbar,* 330 F.3d at 672. Accordingly, there is substantial evidence to support the ALJ's finding that Woods' subjective reports of pain do not rise to the level of disability. *See Ortiz v. Barnhart,* 70 Fed. Appx. 162, 164 (5th Cir.2003); *Jones v. Barnhart,* 35 Fed.Appx. 390 (5th Cir.2002).

### 3. *Residual Functional Capacity*

■ Under the Act, a person is considered disabled:

... only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for [him], or whether he would be hired if he applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 216; *Myers,* 238 F.3d at 619; *Greenspan,* 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson,* 309 F.3d at 272; *Boyd,* 239 F.3d at 705; *Shave,* 238 F.3d at 594; *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir.2000).

■ To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be as-

sessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir.1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir.1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as he "is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995).

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the Regulations—also referred to as the grids—without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Id.* at 461–62, 103 S.Ct. 1952 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects he must lift and whether extensive movement or use of arm and leg controls is required.

*Id.* at 462 n. 3, 103 S.Ct. 1952 (citations omitted).

■ In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The SSRs are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do

sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work.... RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.... The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that a claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler,* 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir.1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton,* 209 F.3d at 458 (citing *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987); 20 C.F.R. § 404.1569(b)). Nevertheless, use of the grid rules is appropriate only when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his or her residual functional capacity. *See Crowley,* 197 F.3d at 199; *accord Watson,* 288 F.3d at 216; *Loza v. Apfel,* 219 F.3d 378, 398 (5th Cir.2000); *Newton,* 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy. *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such

as mental illness, significantly affect a claimant's RFC. *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

In the case at bar, substantial medical records support a history of both physical and mental impairments. In relation to the physical impairments, the ALJ relied heavily on inconsistencies in the medical record. Particularly, the ALJ referenced conflicts between Drs. Samaan and Scardino and clinical provider M. Heatin as to the duration of Woods' inability to work. The ALJ specifically acknowledged the existence of Woods' limitations but noted that Woods' physicians, with the exception of Dr. Samaan, had only found a temporary disability that prevented him from working for six months. As for Dr. Samaan's evaluation that Woods was permanently disabled, the ALJ discounted Dr. Samaan's opinion, finding it to be inconsistent with the record as a whole and "not entitled to controlling weight." (R. 28).

With respect to Woods' mental impairments, the medical expert Dr. Lazar testified, based on his review of the record, that Woods has a depressive disorder and suffers from a history of substance abuse, although he found Woods' substance abuse to be in remission. (R. 66–67). Dr. Lazar found that Woods' psychotic features only occurred when he was under stress and thus he should not be placed in stressful environments where he is subjected to deadlines or production quotas. (R. 66–67). Otherwise, Dr. Lazar opined that Woods' psychotic features did not significantly interrupt his daily function. (R. 66–67). He also testified that he had reviewed the paragraph B and C criteria of listing 12.04 and concluded:

... there is no indication of significant decline in his cognitive functioning or ADLs. On the contrary, there are [sic] some documentation ... which shows that he's rated as functioning fairly well. I'm referring to the exhibit of 473 and 483 which he is rated as functioning—on a scale from one to ten, he is rated as being eight. So in my opinion, the claimant does not meet or satisfy the criteria for paragraph B or C of 12.04 listing.

(R. 67).

In determining Woods' RFC, the ALJ found that Woods had severe impairments of major depressive disorder, learning disability, post traumatic stress disorder, degenerative disk disorder of the lumbar and thoracic spine, status post left shoulder injury, obesity, Hepatitis C, and a history of substance abuse. (R. 26). The ALJ, however, found that these impairments did not meet or equal those listed in Appendix 1, Subpart P, Regulations No. 4, and that no treating physician had made any findings of a sufficient severity to suggest otherwise. Thus, the ALJ made the following findings regarding Woods' functional limitations:

[T]he claimant suffers from impairments that restrict, to varying degrees, his abilities to perform some work related tasks. However, considering the record as a whole, the undersigned finds the evidence of record supports a finding that the claimant is able to perform work of light exertional level. Light work, by definition, requires approximately six hours a day of walking and standing and lifting or not more than 20 pounds. The claimant cannot climb ladders or crawl. He can occasionally reach overhead with the left arm. He cannot perform detailed our [sic] complex tasks but he can perform one-two step tasks in a structured environment. He can have only occasional interaction with the general public. He cannot perform job tasks with high stresses, such as short deadline or high quotas.

(R. 26).

As set forth above, the ALJ also found that a review of the medical record did not

fully support the degree of pain and limitations alleged by Woods. (R. 27). The ALJ specifically disregarded the testimony of Dr. Samaan in making his decision, deferring instead to the rest of the medical record. (R. 28).

In relation to Woods' mental impairments, the ALJ acknowledged that Woods could not be placed in "stress and social situations," however, the ALJ opined that Woods was able to interact with others, as manifested by his demonstrated capacity to maintain relationships and attend AA meetings and church. (R. 27). The ALJ also found that Woods' "concentration, persistence, or pace" was only mildly limited, as evidenced by his ability to perform serial threes and other calculations. (R. 27). Also, although the record indicates several episodes of decompensation, the ALJ noted that during all of these episodes, Woods was not taking his medication as prescribed or was abusing alcohol. (R. 27). Thus, the ALJ determined that Woods' "mental impairments have only a mild impact on his ability to perform daily activities." (R. 27–28). The ALJ noted that the VE testified that Woods' mental and physical residual functional capacity would permit him to "return to his past relevant work as a security guard." (R. 28).

The VE, however, failed to describe the specific physical and mental requirements of Woods' job as a security guard. Similarly, the VE did not describe the setting within which Woods' past work was performed. When reviewing the job description of "security guard" in the DOT, it appears incompatible with Woods' residual functional capacity. Indeed, a security guard must be adept at dealing with people and performing effectively under stress. *See Dictionary of Occupational Titles,* § 372.667–034 (4th ed.1991). For example, as described in the DOT, the job

of security guard requires that ability to "carry out instructions," "deal with problems requiring concrete variable," work "at a production rate," and generally interact with trespassers, miscreants, and vehicular traffic. *See id.* It also requires one to be capable of responding to police or fire emergencies. *See id.* Woods' RFC, however, restricts him to "one-two step tasks in a structured environment" with only "occasional interaction with the general public." (R. 29). Woods cannot perform jobs with high stresses, such as short deadlines or high quotas. (R. 29). He cannot perform detailed or complex tasks. (R. 29).

When the conflict between the VE's testimony and the DOT is implied or indirect, the Fifth Circuit has held that an ALJ may rely on a VE's testimony "provided that the record reflects an adequate basis for doing so." *See Carey v. Apfel,* 230 F.3d 131, 146 (5th Cir.2000). Thus, if substantial evidence supports the VE's opinion, the court may affirm the Commissioner, irrespective of the claimed conflict between the DOT descriptions and the VE's specific testimony. The Fifth Circuit has not yet addressed squarely the related but separate question of whether the Commissioner's decision denying benefits lacks substantial evidentiary support if based on a VE's testimony that directly and obviously conflicts with the DOT's description of non-exertional and/or skill levels required for particular jobs. Moreover, in *Carey,* the Fifth Circuit carefully distinguished the indirect conflict involved there from direct and obvious conflicts. The Fifth Circuit identified the latter as existing "when the vocational expert's characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill level provided for that job in the DOT" and, to a less obvious extent, "when the vocational expert's testimony creates a

conflict or discrepancy between the ALJ's determination of the claimant's residual functional capacity and the DOT job descriptions." *Id.* at 146. Because the Fifth Circuit so carefully distanced the rule it established in *Carey* from situations involving direct conflicts, an inference can be drawn that a more stringent, less deferential rule might apply when the VE's testimony directly and obviously conflicts with DOT job descriptions.

■ Here, the VE's testimony that an individual with Woods' mental functional capacity could perform the job of security guard is in direct conflict with the DOT job descriptions of a security guard. Neither the VE nor the ALJ recognized or discussed the conflict between the VE's testimony and the DOT. Likewise, neither the VE nor the ALJ articulated plausible reasons for finding the VE's testimony more credible under the circumstances. Independent review of the administrative record discloses no substantial evidence that Woods can perform his past relevant job as a security guard.

To the extent the Commissioner contends that the ALJ had no affirmative duty to inquire about conflicts between the DOT and VE testimony because the DOT is not a substitute for VE testimony and/or that a VE can better determine the impact of specific individual limitations on an occupational base, these general propositions of law do not apply in this case because the VE, Hooge, lacked sufficient information to make an informed conclusion regarding Woods' past job duties as a security guard.

Because it appears that the job of security guard is beyond Woods' mental residual capacity, remand is necessary for the Commissioner to consider the conflict between the vocational expert's ("VE") testimony and Dictionary of Occupational Titles about whether the job of security guard, which was the job identified by the VE as past relevant work Woods could perform, is beyond Woods' mental residual capacity.

### III. *Conclusion*

In sum, the record does not provide substantial evidence supporting the Commissioner's decision that Woods is not disabled. Accordingly, it is therefore

**ORDERED** that Plaintiff Larry S. Woods' Motion for Summary Judgment (Docket Entry No. 8) is **GRANTED**. It is further

**ORDERED** that the Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration, Motion for Summary Judgment (Docket Entry No. 9) is **DENIED**. It is finally

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner, pursuant to "sentence four" of the Social Security Act, 42 U.S.C. § 405(g), for a new hearing to reevaluate Woods' mental residual functional capacity, obtain vocational testimony, and determine Woods' ability to perform the demands of any identified jobs.

### AMENDED FINAL JUDGMENT

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Plaintiff Larry S. Woods' Motion for Summary Judgment (Docket Entry No. 8) is **GRANTED**. It is further.

**ORDERED** that the Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), Motion for Summary Judgment (Docket Entry No. 9) is **DENIED**. It is finally

**ORDERED** that the case is REVERSED and **REMANDED** to the Commissioner, pursuant to "sentence four" of the Social Security Act, 42 U.S.C. § 405(g),

for a new hearing to reevaluate Woods' mental residual functional capacity, obtain vocational testimony, and determine Woods' ability to perform the demands of any identified jobs.

This is a **FINAL JUDGMENT**.