# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30524

United States Court of Appeals
Fifth Circuit

**FILED**

February 12, 2014

Lyle W. Cayce
Clerk

FRANK BAYER,

Plaintiff - Appellant,

v.

CAROLYN W. COLVIN, Acting Commissioner, Social Security
Administration,

Defendant - Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-2355

Before JONES, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Frank Bayer filed an application for disability insurance benefits, alleging a physical impairment and a learning disability. The Administrative Law Judge ("ALJ") denied the benefits because Bayer's learning disability was not severe and because, despite his physical limitations, Bayer had a "residual functional capacity" to successfully work in sedentary positions. Bayer then filed suit against the Commissioner of the Social Security Administration (the "Commissioner"), alleging that (1) he was denied procedural due process

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30524

because the ALJ prohibited him from presenting an interrogatory to the vocational expert ("VE") who testified at the administrative hearing; (2) the ALJ's finding that Bayer's learning disability was not severe was not supported by substantial evidence; and (3) the ALJ failed to consider evidence of all of Bayer's limitations when concluding that he had a residual functional capacity. The district court granted the Commissioner's motion for summary judgment. Because the Commissioner's decision is supported by substantial evidence and the proper legal standards were applied, we AFFIRM.

I.

Bayer alleges that he suffers from two distinct impairments: a back injury and a learning disability. Bayer suffered his back injury on or about September 30, 2008, while lifting a heavy object at his place of work. During an examination on October 3, 2008, a doctor noted that Bayer appeared to be in severe and pain and was unable to walk without assistance. A magnetic resonance imaging ("MRI") study on October 20, 2008, revealed degenerative damage and disc protrusion. On November 13, 2008, Dr. Carl Lowder, a neurosurgeon, examined Bayer and diagnosed a lumbar strain with underlying disc protrusion. Dr. Lowder recommended aggressive physical therapy and swimming. On January 8, 2009, after eighteen sessions of physical therapy, Bayer's physical therapist stated that Bayer's lumbar strength and range of motion had not functionally improved. Dr. Lowder informed Bayer that his only other option was back surgery. Bayer sought a second opinion from Dr. Lucien Miranne, Jr., who agreed with the recommended surgery.

Dr. Lowder performed back surgery on Bayer on April 7, 2009. Three days later, Dr. Lowder discharged Bayer and imposed routine back surgery restrictions. When Dr. Lowder examined Bayer at the end of April, he noted that Bayer was doing "relatively well" and recommended physical therapy. From May 2009 to July 2009, Bayer attended twenty-four physical therapy

appointments. At the last appointment, the physical therapist observed that Bayer "continue[d] to progress slowly but steadily in most objective measures." The physical therapist also noted that Bayer would "benefit from ongoing strengthening, aiming for normal levels of lumbar strength." The record does not reflect any additional physical therapy.

On July 13, 2009, Bayer visited Dr. Lowder because of back pain. Dr. Lowder advised that Bayer had engaged in "ample therapy" and had "had ample time to get over th[e] surgery." Dr. Lowder ordered another MRI, which did not show any evidence of recurrence but did show minor degenerative changes elsewhere. Dr. Lowder stated that Bayer "need[ed] no further surgery" and that he had reached maximum medical improvement ("MMI").

On September 21, 2009, Dr. Lowder again stated that Bayer had reached MMI. Dr. Lowder also assessed a Physical Residual Functional Capacity Questionnaire ("RFC") that Bayer had completed. The RFC stated that Bayer's "validity is good" and assessed "that he is working at a light or light medium level, but with inability to perform most lifting activities frequently, frequently means between 24 and 66%." Dr. Lowder opined that Bayer:

> should be released to work on an OSHA category of light work physical demand level that is lifting up to 20 pounds occasionally, which means up to 1/3 of the day up to 10 pounds, 1/3 to 2/3 of the day and then he can be allowed to sit or stand doing his work, but not required to walk and not required to lift anything over 20 pounds.

Dr. Lowder further opined that Bayer could walk two city blocks, sit for at least six hours in an eight-hour workday, stand/walk for about two hours in an eight-hour workday, frequently lift less than ten pounds, and occasionally lift ten to twenty pounds. Bayer could rarely twist or stoop and could never crouch, squat, climb ladders, or climb stairs. Dr. Lowder believed that Bayer would sometimes need to take one or two unscheduled breaks of five to ten minutes

per workday and that he would likely be absent from work about two days per months because of his impairments.

On October 15, 2009, Bayer went to an appointment with Dr. Michael Dunn, who observed paralumbar tenderness, no muscle spasms from pain, and a normal gait. Dr. Dunn agreed that Bayer could perform work as Dr. Lowder described in September 2009. Bayer's last medical visit in the record occurred on March 15, 2010, when he complained that he was short-tempered, irritable, and fatigued. However, the record does not reflect any complaints of low back or leg pain.

Bayer also alleges that he has a learning disability that impairs his ability to read and write. In April 1988, when Bayer was in the sixth grade, he scored in the third percentile for total reading and in the tenth percentile for total language on the California Achievement Test. In June 1994, when Bayer graduated high school, the school counselor indicated that he had difficulty in reading comprehension and read at a second grade level. Nonetheless, Bayer's school records show that he passed his high school graduation examinations in Language Arts, Mathematics, Science, and Social Studies.

In November 2002, Dr. Linda Brown conducted a psychological evaluation of Bayer because he wanted to attend Southeastern Louisiana University. Dr. Brown found Bayer's IQ to be in the average range, except for working memory, which was in the borderline range. Dr. Brown noted severe deficits in reading ability, with Bayer scoring in the first percentile. Dr. Brown diagnosed Bayer with a reading disorder for basic reading skills and a disorder of written expression. Following that evaluation, Bayer attended Southeastern Louisiana University for one year.

In July 2009, Dr. Jeanne George, a non-examining state agency expert, completed a Psychiatric Review Technique Form for Bayer. Dr. George

determined that Bayer had the non-severe medically determinable impairments of "Reading Disorder and Disorder of Written Expression." Dr. George also found that Bayer's impairments caused mild restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. She opined that, based on Bayer's work as an assistant grocery store manager and as a retail store manager, his reading and written language disorder was not severe because his condition would cause only mild to minimal impairments.

On July 13, 2009, Bayer, who was then thirty-three years old, filed for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423(d)(1)(A). Bayer alleged a disability onset date of September 30, 2008. The claim for benefits was denied on July 31, 2009. An administrative hearing before an ALJ then took place on April 9, 2010. Bayer and the VE, Kelly Roberts, testified at the hearing. Bayer testified that his back pain caused limitations: he could only walk about one block and could only stand or sit for thirty minutes at a time; he had to lie down for four hours in an eight-hour day and had to walk around every thirty minutes; and he could not lift his twenty-five pound child without pain. Bayer also testified that he had difficulty reading and writing, was in special education classes in school, and had his wife complete any paperwork on his behalf. Bayer did admit that he had filled out paperwork for jobs over the years.[1]

---

[1] In the fifteen years prior to his alleged disability onset date, Bayer had work experience as an assistant manager, bag boy, meat selector, seafood manager, shipping and receiving clerk, stocker, and store manager. From 1995 to 1996, Bayer was a meat selector with tasks involving pulling store orders for meat, seafood, dairy, and produce departments; placing them on pallets; and moving them in the warehouse until the order was complete. From 1998 to 1999, Bayer was a seafood manager tasked with ordering supplies, scheduling employees, comparing man hours to sales, and writing reports. From 1999 to 2003, Bayer was an assistant manager, tasked with ordering merchandise and supplies, scheduling

No. 13-30524

Roberts testified to the specific vocational preparation ("SVP"), as defined by the U.S. Department of Labor, for Bayer's past work experiences.[2] These experiences included: (1) bagger, SVP 2, unskilled, medium work; (2) shipping and receiving clerk, SVP 5, skilled, medium work; (3) stock clerk, SVP 4, semi-skilled, heavy work; and (4) retail manager, SVP 7, skilled, light work. Roberts testified that, for a hypothetical person of Bayer's age, education, work history and limitations, there would be jobs such a person could perform, such as interviewer, receptionist/information clerk, and office clerk. Roberts also stated that the Dictionary of Occupational Titles ("DOT") provides a language number to describe the capabilities for each position. Roberts testified that a retail manager's language number was four, which meant a capability for reading "novels, poems, newspapers, [and] periodicals" and for writing "business letters, summaries and reports." Roberts further testified that the shipping and receiving clerk's language number was two, which meant a capability for reading "passive vocabulary of 5,000 to 6,000 words . . . at a rate of 190 to 215 words per minute" and "writ[ing] compound and complex sentences; employ[ing] punctuation."

After the ALJ finished questioning Roberts, Bayer's counsel was given the opportunity to cross-examine the VE. Bayer's counsel asked the Roberts

---

workers, and writing or completing reports. From 2004 to 2005, Bayer was a store manager, in which capacity he completed reports and filled in numbers. From 2006 to 2008, Bayer was a shipping and receiving clerk who checked-in and inspected merchandise, shipped orders, and located orders for customers.

[2] The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, *Dictionary of Occupational Titles* ("DOT"), App. C. II (4th ed. 1991). An SVP 2 job typically has a learning period of "[a]nything beyond short demonstration up to and including 1 month;" an SVP 4 job typically has a learning period of "[o]ver 3 months up to and including 6 months;" an SVP 5 job typically has a learning period of "[o]ver 6 months up to and including 1 year;" and an SVP 7 job typically has a learning period of "[o]ver 2 years up to and including 4 years." *Id.*

only one question about the corresponding occupational codes from the DOT. Roberts stated that she did not have the codes at the time but could provide them shortly after the hearing. Bayer's counsel then stated, "Judge I don't have any further questions." Later that day, the ALJ advised that Roberts had provided the occupational codes. In response, Bayer's counsel requested that the following interrogatory be submitted to the VE:

> Using the limitations set out in the first hypothetical at the hearing and adding the limitation that the person would have severe deficits in overall broad reading and overall broad written language, would that person be able to perform the jobs which you cited in response to that hypothetical?

The ALJ denied the request.

On June 11, 2010, the ALJ found that Bayer was not disabled under the Act after analyzing Bayer's claims pursuant to the five-step, sequential evaluation process. 20 C.F.R. 404.1520(a). At step one, the ALJ found that Bayer had not engaged in substantial gainful activity since his alleged onset date. At step two, the ALJ found that Bayer had the severe impairment of a history of lumbar surgery. At step three, the ALJ determined that Bayer's impairments did not meet or medically equal the severity of any impairment listed in the Commissioner's regulations found at 20 C.F.R. Part 404, Subpart P, Appendix 1. Before proceeding to step four, the ALJ addressed Bayer's credibility and residual functional capacity and found that Bayer's allegations regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. The ALJ also found that Bayer retained the residual functional capacity to perform sedentary work activity except that Bayer required a sit/stand option and had to avoid concentrated exposure to vibration. Moving on to step four, the ALJ found that Bayer could not perform his past relevant work. And at step five, with the VE's assistance, the ALJ determined that there were jobs in significant numbers in the national

No. 13-30524

economy that Bayer could perform. Thus, the ALJ concluded that Bayer was not disabled.

After exhausting his administrative remedies, Bayer sought relief in federal court. The district court affirmed the Commissioner's denial of benefits, concluding that: (1) substantial evidence in the record supported the ALJ's finding that Bayer's mental impairment was non-severe; (2) Bayer's right to procedural due process was not infringed because the ALJ allowed his counsel to fully question the VE at the hearing; and (3) substantial evidence supported the ALJ's ultimate conclusion that Bayer was ineligible for disability benefits. Bayer appealed.

II.

We review the Commissioner's denial of benefits under the same standard as the district court. *Domingue v. Barnhart*, 388 F.3d 462 (5th Cir. 2004). We analyze whether (1) the Commissioner's decision is supported by substantial evidence and (2) the proper legal standards were used to evaluate the evidence. *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). If the Commissioner's decision "is supported by substantial evidence, the findings are conclusive and must be affirmed." *Id.* (quoting *Marcello v. Bowen*, 803 F.2d 851, 853 (5th Cir. 1986)) (internal quotation marks and citation omitted). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* A court will find no substantial evidence "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir.1983)) (citations omitted).

The burden of proof is on the claimant to prove that he is disabled. *Perez v. Heckler*, 777 F.2d 298, 300 (5th Cir. 1985). In making a disability

No. 13-30524

determination, the ALJ is required to consider the sequential five-prong test proscribed by 20 C.F.R. § 404.1520(b)–(f): (1) whether the claimant is working and the work he is doing is substantial gainful activity; (2) whether or not the claimant has a severe impairment; (3) whether the claimant's impairment meets the duration requirement; (4) whether the claimant has a residual functional capacity and is still able to do past relevant work; and (5) whether the impairment prevents the claimant from doing any other work.  If the claimant can prove the first four steps, then the "burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding." *Id.* (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)) (internal quotation marks omitted).

## III.

Bayer raises three issues on appeal.  First, he argues that his right to procedural due process was violated when the ALJ refused to submit his interrogatory to the VE.  Second, Bayer argues that the ALJ did not have substantial evidence to support its finding that Bayer's reading and writing disorder was not a severe impairment.  Third, Bayer argues that the ALJ's residual functional capacity determination was not supported by substantial evidence.  We address each of Bayer's arguments in turn.

## A.

Bayer alleges that the ALJ denied him his right to cross-examine the VE, thereby depriving him of procedural due process, by denying the request to submit the hypothetical to the VE.  *See Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) ("Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports." (internal quotation marks and citation omitted)).

9

No. 13-30524

We conclude that the ALJ did not deny Bayer his procedural due process rights because Bayer's counsel had the opportunity to fully cross-examine the VE at the administrative hearing. In *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995), the court found that a claimant's procedural due process rights were not violated where the claimant's counsel had the opportunity to cross-examine the VE at the administrative hearing. Specifically, the court distinguished the factual situation there from the facts in *Lidy*, 911 F.2d 1075, and *Tanner v. Secretary of Health & Human Services*, 932 F.2d 1110 (5th Cir. 1991). In *Vaughan*, the claimant's counsel had the opportunity to cross examine the VE at the administrative hearing, while in *Lidy* and *Tanner*, the claimants were *completely* denied the opportunity to cross-examine the VE. *Vaughan*, 58 F.3d at 132. The situation here was not one in which counsel was denied the opportunity to cross-examine. The ALJ allowed Bayer's counsel to question the VE at the administrative hearing and did not cut short Bayer's cross-examination. The cross-examination only came to an end when Bayer's counsel indicated that he was finished with his questioning. Bayer was aware of the information underlying the proposed hypothetical question at the time of the hearing but failed to inquire about it on cross-examination. The hypothetical did not hinge on the later-supplied DOT codes.

Moreover, the ALJ was not required to submit a hypothetical question to the VE based on limitations that the ALJ did not recognize. The ALJ explained at length why he rejected Bayer's claim of a severe reading and writing disorder. The ALJ noted that Bayer passed his high school graduation exit examinations in Language Arts, Mathematics, Science, and Social Studies. The ALJ also noted that Bayer had performed skilled occupations in the past where reading and writing are essential. The ALJ further observed that while Bayer initially stated that his wife filled out all his paperwork, he eventually admitted that he had completed paperwork himself. The ALJ also relied on

10

the objective medical evidence in finding Bayer's learning disorder non-severe. The ALJ discussed Dr. George's opinion that Bayer's learning disability was not a severe impairment and Dr. George's assessment that Bayer's alleged learning disability would only cause mild to minimal impairments. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (concluding that an ALJ's rejection of expert testimony was reasonable where "objective medical evidence did not coincide with the hypothetical assumptions posed to the vocational expert"). Therefore, the ALJ's refusal to submit the hypothetical did not violate Bayer's due process rights.

B.

Bayer next argues that the ALJ improperly determined that Bayer's reading and written language disorder was not a severe impairment pursuant to step two of the sequential evaluation process. Specifically, Bayer argues that the ALJ improperly applied the standard set forth in *Stone v.* Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985), and failed to consider important objective medical evidence.

The *Stone* standard provides that "[a]n impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (internal quotation marks and citations omitted). Bayer contends that the ALJ improperly applied the *Stone* standard and cites Social Security Ruling ("SSR") 96-8p for the proposition that an impairment is severe when it limits the individual's ability to perform work activities and, thereby, narrows the availability of other work. Bayer misapplies the SSR, however. The SSR to which Bayer cites does not define "severe impairment," but rather "not severe impairment."

11

No. 13-30524

Moreover, "[c]onflicts in the evidence are for the Commissioner to resolve." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Here, the ALJ "completely reject[ed] the claimant's allegation that he is unable to read and write, including the affidavits submitted by the claimant and his wife." In resolving the conflicting evidence, the ALJ noted that Bayer had performed several jobs requiring reading and writing skills that contradict his allegation that his reading and writing disorder was a severe impairment. The ALJ also considered Bayer's extensive history of performing skilled work as a grocery store assistant manager, a meat selector, a seafood manager, a shipping and receiving clerk, and a store manager. Indeed, Bayer testified that he was able to find ways to perform his job functions despite his alleged limitations, thereby demonstrating, under *Stone*, that his disability did not interfere with his ability to work. On the learning disability issue, the ALJ relied on Dr. George's medical opinion in deciding that Bayer did not have a severe learning disorder. Although the ALJ did not specifically address Dr. Brown's opinion, Dr. George's opinion considered Dr. Brown's assessment of Bayer and even used the same language Dr. Brown used—"Reading Disorder and Disorder of Written Express"—to identify Bayer's mental disorder. The fact that there may have been some contrary evidence in the record to support a finding that Bayer's disorder was a severe impairment does not undermine the ALJ's determination. *See Carey*, 230 F.3d at 135.

C.

The ALJ concluded that Bayer has the residual functional capacity to perform sedentary work with a sit/stand option and with no concentrated exposure to vibration. Residual functional capacity is the ability to work despite physical or mental impairments. 20 C.F.R. § 404.1545. "A person's "residual functional capacity' is determined by combining a medical assessment of an applicant's impairments with descriptions by physicians, the

12

applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (citation omitted). The residual functional capacity is based on all evidence, including medical evidence. SSR 96-8p. Bayer argues that the ALJ's ruling was contrary to the medical evidence in the record and does not include all of Bayer's limitations and that, as a result, there is not substantial evidence to support the ALJ's residual functional capacity determination.

Bayer argues that the ALJ improperly discounted or ignored Dr. Lowder's opinion that Bayer would miss two days of work per month due to his impairments and Dr. Lowder's opinion regarding Bayer's difficulties with attention and concentration, postural limitations, or the need for breaks in the workday. "'[O]rdinarily, the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.'" *Perez v. Barnhart*, 415 F.3d 457, 465–66 (5th Cir. 2005) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). The treating physician's opinions are not conclusive, however: "'[W]hen good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony.' Recognized 'good cause' exceptions include 'disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence.'" *Id.* (citations omitted).

We conclude that the ALJ did not disregard Dr. Lowder's evaluation. Rather, the ALJ considered Dr. Lowder's evaluation in full. Though Dr. Lowder noted problems, his report also showed improvement in Bayer's condition. Even after the physical therapist recommended more therapy in July 2009, Dr. Lowder opined that Bayer did not need continued therapy. The subsequent MRI that Dr. Lowder ordered failed to show any recurrent disc

herniation.  Dr. Lowder's September 21, 2009 medical report determined that Bayer had reached MMI on August 6, 2009, and he opined that Bayer could be released to perform light work where he could sit or stand doing his work, but not be required to walk or lift over twenty pounds.  Dr. Dunn, one of Bayer's doctors, examined Bayer on October 15, 2009, and also agreed that Bayer could perform light work as outlined in Dr. Lowder's September 2009 opinion.  A claimant who can perform light work can also do sedentary work.  Therefore, these two medical opinions support the ALJ's conclusion that Bayer had a residual functional capacity for a reduced range of sedentary work.

It is "within the discretion of the ALJ to determine the credibility of the various medical reports in the record." *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  The ALJ noted that Dr. Lowder offered two inconsistent opinions, one in which he opined that Bayer can perform light work and one in which he opined that Bayer can only perform sedentary work.  This inconsistency was good cause for the ALJ to discount some of Dr. Lowder's opinions.  Bayer also complains that the ALJ discounted Dr. Lowder's opinion that Bayer might be expected to miss work two days a month due to his impairments.  However, there is no longitudinal medical evidence in the record to support this opinion.  A doctor's opinion lacks persuasive weight when it is not supported by evidence.  *See Apfel*, 209 F.3d at 455 ("The ALJ found [the claimant's] opinion regarding residual functional capacity was not reliable because it was insufficiently substantiated by clinical or diagnostic evidence, and thus was conclusory.").

Bayer also contends that the ALJ should have included mental limitations in his residual functional capacity finding.  However, the ALJ found that Bayer's admission at the administrative hearing that he completed his own paperwork, his ability to pass his high school exit examinations, his ability to perform skilled work for several years, and Dr. George's medical opinion

that Bayer's mental disorder was non-severe all refuted a finding that Bayer had a learning disability that impacted his residual functional capacity. Accordingly, there is substantial evidence to support the ALJ's finding.

We AFFIRM.